In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2589

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID G. SKLENA,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 CR 302-2—**Samuel Der-Yeghiayan**, *Judge.*

ARGUED JANUARY 13, 2012—DECIDED AUGUST 23, 2012

Before POSNER, WOOD, and HAMILTON, *Circuit Judges.*

WOOD, *Circuit Judge.* In March 2009, David Sklena and his co-defendant Edward Sarvey were charged with seven counts of wire and commodity fraud, as well as two counts of noncompetitive futures contract trading. Sarvey died before the start of his trial, but Sklena went to trial. There he sought to use Sarvey's deposition before the U.S. Commodity Futures Trading Commission (CFTC) as evidence of his innocence, but the district

court excluded it as inadmissible hearsay and eventually convicted Sklena of seven of the nine charged counts. Sklena now appeals. He argues that the government's evidence was insufficient to support his convictions, and in the alternative, that the district court abused its discretion by excluding Sarvey's deposition testimony. Although we are satisfied that the government's evidence was sufficient, we conclude that the district court erred by excluding Sarvey's previous testimony. We therefore reverse Sklena's convictions and remand for further proceedings.

**I**

In April 2004, Sklena and Sarvey were floor traders in the Five-Year Treasury Note futures pit at the Chicago Board of Trade (CBOT). At that time, Sklena was just a "local," which means that he was authorized to trade only on his own behalf, whereas Sarvey was a "broker" and could therefore trade for himself as well as for his customers.

April 2, 2004, turned out to be a busy day at the CBOT: the price of the Five-Year Note futures fluctuated wildly, resulting in what was, in Sklena's opinion, "the busiest day in the history of the [CBOT]." It was on this day that Sarvey and Sklena executed the series of transactions that form the basis of this criminal prosecution. Everything happened between 7:31 and 7:38 in the morning; even seconds counted, and so we include them in this account. At 7:31:35 the market price for Five-Year Note futures fell to 111.050, apparently in response to

unemployment statistics that had just been released. This was a price that triggered a series of sell stop orders, which obligated Sarvey to sell 2,474 of his customers' contracts at the best available price. Over the course of the next few minutes, the price began to rise again. This was when, according to the government, Sklena and Sarvey conspired to sell Sarvey's customers' contracts noncompetitively. At about 7:37, other traders noticed that Sklena and Sarvey were engaged in a private conversation while the rest of the pit was reacting to the volatile market conditions. Then, at 7:37:27, Sarvey sold 2,274 contracts to Sklena at a price of 111.065 each, and Sklena immediately sold 485 of those contracts back to Sarvey at 111.070. Both of these prices were well below the prevailing market price, and so when Sklena and Sarvey resold these contracts openly in the pit over the course of the next seven minutes, they were able to reap a healthy profit. Sklena's sales of his remaining 1,789 contracts netted him over $1.6 million, while Sarvey earned at least $350,000 from the sale of his 485 contracts.

In January 2008, the CFTC filed a civil complaint against Sarvey and Sklena, alleging that the two "engaged in a series of non-competitive trades" that defrauded customers out of over $2 million. During discovery, the CFTC took lengthy depositions from both Sarvey and Sklena regarding these trades, but its civil enforcement action was temporarily stayed during the pendency of the criminal proceedings that underlie this appeal. (The civil charges against Sarvey were dismissed after his death, and the District Court for the Northern District of Illinois granted the CFTC's motion

for summary judgment against Sklena in February 2012. See *CFTC v. Sarvey & Sklena,* No. 08 C 192, 2012 WL 426746 (N.D. Ill. Feb. 10, 2012). No appeal was taken from that judgment.)

On March 31, 2009, a grand jury indicted Sklena on six counts of wire fraud, one count of commodity fraud, and two counts of noncompetitive futures contract trading. Sarvey was charged with the same offenses, as well as with two additional counts of noncompetitive futures trading, but as we said, he passed away before his trial could begin. The Department of Justice proceeded with its prosecution of Sklena and, after a bench trial in October 2010, the district court convicted Sklena on seven counts. He now appeals.

## II

We begin with Sklena's contention that the government's evidence is insufficient to sustain his convictions for wire and commodities fraud. We review this *de novo,* drawing all inferences in favor of the prosecution. *United States v. Speed*, 656 F.3d 714, 717 (7th Cir. 2011). Sklena argues that the government failed to prove that he *knew* he was purchasing contracts that belonged to Sarvey's customers, thereby defrauding those customers, as opposed to purchasing contracts from Sarvey's own account and thus merely engaging in noncompetitive trades. The government, however, contends that it has made its case by at least one of three ways. First, it contends that it has proved that Sklena actually knew that he was trading in customer contracts. Second, it argues

that even if Sklena did not actually "know" Sarvey had sold him customer contracts, he is nevertheless liable because he consciously avoided such knowledge. Finally, it argues that Sklena may be liable for Sarvey's fraud under *Pinkerton v. United States*, 328 U.S. 640 (1946). Although the evidence supporting the contention that Sklena had actual or constructive knowledge of the owner of the futures contracts at issue is thin, we are satisfied that his conviction may be sustained under *Pinkerton*.

## A

The district court's finding that Sklena actually knew that Sarvey was selling him customer contracts stands or falls on the following evidence. First, in response to a question at his CFTC deposition about Sarvey's customers, Sklena noted that Sarvey did not receive any complaints from his customers about the sale price that they received. Because "Sklena did not answer the question by stating that there w[ere] no customers involved," the district court inferred that Sklena must have known that the opposite was true—that is, that he was buying customer contracts. Second, because Sklena occasionally referred to Sarvey as "the *broker* next to him," the district court concluded that Sklena knew that Sarvey was selling on behalf of his customers (emphasis added). (As noted above, brokers may sell on behalf of either themselves or customers, while locals may trade only on behalf of themselves).

If this were all the government had, we would probably say that it is not enough. An inference based on what

Sklena did not say, together with Sklena's accurate short-hand reference to Sarvey as a "broker,"does not prove beyond a reasonable doubt that Sklena knew who Sarvey was acting for, especially given the fact that the CFTC itself has blurred the distinction between brokers and locals. See Press Release, *U.S. Commodity Futures Trading Commission, CFTC Charges Two Chicago Board of Trade Floor Brokers with Defrauding Customers Out of More Than $2 Million* (Jan. 10, 2008), available at http://www.cftc.gov/PressRoom/PressReleases/pr5434-08 (referring to both Sklena and Sarvey as "brokers").

## B

The evidence supporting the contention that Sklena consciously avoided knowledge about the true owners of the contracts sold is similarly thin. When asked if he knew that Sarvey had done a trade for Mitsubishi on April 2, Sklena responded, "I did not know, no. I don't care who he does 'em for." The district court found that this statement "indicates a deliberate avoidance on Sklena's part." But the simple fact that Sklena did not care who Sarvey's customers were tells us nothing about the distinct question whether Sklena consciously avoided knowing that Sarvey was trading on behalf his customers at all.

The court also credited the government's argument that Sarvey's trading activity was so irrational that Sklena must have known that Sarvey was acting illegally. This argument falls short for two reasons. First, it is not *inevitable* that Sklena must have viewed Sarvey's decision

to sell 2,274 contracts and then buy back 485 at a higher price as completely irrational. Sarvey sold these contracts at a price of 111.065, but bought them back at 111.070. If Sarvey was looking to reduce his exposure in a volatile market, then the total loss sustained might equally be seen as a reasonable cost to reduce his risk. Even if we agreed that Sarvey's activity was irrational, that is still a far cry from illegal. We would not want to hold that floor traders must constantly inquire into the state of mind of their trading partner. Such a rule would have substantial impact on the costs of trading and might risk imposing liability on traders who had no knowledge of any possible fraud. Without something more, such "irrational" trading activity cannot form the basis of knowledge of fraud.

## C

That leaves the *Pinkerton* theory, under which a conspirator may be liable for foreseeable crimes committed in furtherance of a conspiracy. 328 U.S. at 647. "Before *Pinkerton* can be applied, it is of course necessary to show that a conspiracy existed, that the defendant joined the conspiracy, that the other actor was also part of the conspiracy, and that the overt act was both foreseeable and in furtherance of the conspiracy." *United States v. Smith*, 223 F.3d 554, 573 (7th Cir. 2000). We address each of these elements in turn.

In this case, the evidence can support a finding that Sklena and Sarvey entered into a conspiracy to engage in noncompetitive trades. Sklena's willingness to join

such an "illegal venture" subjects him not only to conviction on the counts directly based on the conspiracy's underlying agreement, but also on counts based on foreseeable overt acts that furthered the pair's illicit scheme to make money. *Smith v. Bray*, 681 F.3d 888, 905 (7th Cir. 2012); *United States v. Smith*, 223 F.3d at 573.

The question is thus whether the court was entitled to conclude that Sklena could have foreseen that the contracts that Sarvey sold belonged to his customers, rather than (the only other option) to Sarvey himself. Looking at the record favorably to the government, we conclude that it was. The government put evidence before the court that supported a finding that Sklena knew that Sarvey was not just another "local," but was instead a broker who represented other clients. Sklena admitted as much on several occasions, and on other occasions referred explicitly to Sarvey's customers. The fact that Sarvey sold his customers' contracts was thus foreseeable, and whether Sklena knew that the precise contracts that Sarvey sold to him belonged to those customers is of no moment. The required "criminal intent . . . [wa]s established by the formation of the conspiracy." *Pinkerton*, 328 U.S. at 647.

Furthermore, this transaction "was in execution of the enterprise." *Id.* At the moment the two transactions (the sale to Sklena and the kickback to Sarvey) took place, the market price was going up: Sarvey sold the 2,274 contracts at 111.065 at a time when the market was trading above 112. This was, consistent with their agreement, a "win-win" situation for them: They had allocated

the contracts between themselves noncompetitively, and now they stood to make a significant profit in the open pit. In all, the government proved that Sklena and Sarvey were parties to a conspiracy to engage in illicit trading practices, and that Sarvey's sale of 2,274 of his customers' contracts below market price and his subsequent re-purchase of 485 of those contracts (also below market) were overt acts in furtherance of that conspiracy.

## III

Even if the government's evidence is sufficient to support his conviction, Sklena argues that he is never-theless entitled to a new trial because the district court erred by excluding critical evidence. We agree. Sklena sought to introduce Sarvey's prior deposition testi-mony into evidence under Federal Rule of Evidence 804(b)(1), but the district court denied Sklena's motions under Rule 804 and, in a post-trial ruling, under Rule 403.

The parties (and we) agree that Sarvey's testimony is hearsay. Sklena contends, however, that the testimony is nonetheless admissible under Federal Rule of Evidence 804(b)(1), which provides that

> [t]estimony that [(A)] was given as a witness at a . . . lawful deposition, whether given during the current proceeding or a different one; and [(B)] is now offered against a party who had . . . an opportunity and similar motive to develop it by direct, cross-, or redirect examination

may be admitted where the witness has since become unavailable. FED. R. EVID. 804(b)(1). (The Evidence Rules

were restyled on December 1, 2011, for readability, but there is no substantive difference between the current version, quoted here, and the previous version. See FED. R. EVID. 804(b)(1), 2011 amends.)

Even though Sarvey was unavailable as a witness at Sklena's trial, the district court found that this exception did not apply because (1) the CFTC and the U.S. Department of Justice may not be considered the same party, and (2) the CFTC and the Justice Department did not share "similar motive[s]" to develop Sarvey's testimony. We review the district court's evidentiary ruling for an abuse of discretion and will reverse if the court made an error of law. *United States v. Reed*, 227 F.3d 763, 766 (7th Cir. 2000); see also *FTC v. Trudeau*, 579 F.3d 754, 762-63 (7th Cir. 2009).

A

In order for Rule 804(b)(1)'s exception to apply, the hearsay testimony at issue must meet the criteria spelled out in the rule. That is, the party against whom the evidence is being offered must have been involved in the earlier "trial, hearing, or lawful deposition," and that party must have had an opportunity as well as a similar motive to develop the testimony at the prior proceeding. 30C Michael H. Graham, FEDERAL PRACTICE AND PROCEDURE § 7073 at 382-84 (2011 interim ed.). Thus, the first question is whether the CFTC (which ran the first deposition) and the United States, now represented by the U.S. Department of Justice, are the same party. If so, we must also consider whether the CFTC had in the earlier case

both the opportunity and a similar motive to develop Sarvey's testimony.

There is very little law on the question whether two government agencies, or as in this case the United States and a subsidiary agency, should be considered as different parties for litigation purposes, or if they are both merely agents of the United States. One case from the District of Columbia Circuit that seems to support the proposition that the United States is not a monolith is *United States v. North*, 910 F.2d 843, 906 (D.C. Cir. 1990), in which that court ruled that the Congress and an independent counsel in the executive branch were not the "same party," in part because the independent counsel "has no powers of control over the Congress." See also *FDIC v. Glickman*, 450 F.2d 416, 418 (9th Cir. 1971) (FDIC and United States not the same party when the FDIC "stands in the shoes of the insolvent bank").

In contrast, the CFTC is an executive branch agency that, although possessing its own litigating authority, is required by statute to report on its litigation activities directly to the Justice Department (which as we said acts as the attorney for the United States). See 7 U.S.C. § 13a-1(a), (f)-(g). This statutory control mechanism suggests to us that, had the Department wished, it could have ensured that the CFTC lawyers included questions of interest to the United States when they deposed Sarvey. See H.R. Conf. Rep. 93-1383 (1974) (noting that the provision adopted was a compromise in conference between the Senate, which proposed giving the CFTC autonomous litigation authority, and the

House of Representatives, which would have followed the normal rule under which the Department of Justice represents agencies in court); *cf.* Jody Freeman & Jim Rossi, *Agency Coordination in Shared Regulatory Space*, 125 HARV. L. REV. 1131, 1202 (2012). There is some precedent in other contexts for treating an agency and the United States as the same party. See *United States v. Maxwell*, 157 F.3d 1099, 1102 (7th Cir. 1998) (SBA and the U.S. Navy, for purposes of setting off debts in bankruptcy). For purposes of *res judicata,* "[t]he general rule is that litigation by one agency is binding on other agencies of the same government," though there are exceptions. 18A Charles Alan Wright *et al.,* FEDERAL PRACTICE AND PROCEDURE § 4458 at 560 (2d ed. 2002), citing *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 402-03 (1940). See also *United States v. Stauffer Chemical Co.,* 464 U.S. 165, 169 (1984) (mutual defensive collateral estoppel is applicable against the government to preclude relitigation of same issue already litigated against same party in earlier case); *Montana v. United States,* 440 U.S. 147, 154-155 (1979) (issue preclusion found when United States directed and financed earlier case brought by private contractor and then appeared in its own name in later case). Although the Supreme Court has also found that nonmutual offensive issue preclusion does not apply to the United States, see *United States v. Mendoza,* 464 U.S. 154, 158 (1984), the reasoning of that case has nothing to do with the evidentiary issue now before us.

Our case is not one that involves the differing interests of two separate constitutional branches of government, as *North* did, nor does it involve an agency acting in

the capacity of a representative of a non-governmental party, as *FDIC v. Glickman* did. Instead, the CFTC and the Department of Justice play closely coordinated roles on behalf of the United States in the overall enforcement of a single statutory scheme. Their interdependence is memorialized in the statute. Perhaps the point would be even more clear if the Department had litigating authority for the agency, as it often does, but we decline to hold that this is the *sine qua non* for finding that the United States and one of its agencies are in substance the same party. Functionally, the United States is acting in the present case through both its attorneys in the Department and one of its agencies, and we find this to be enough to satisfy the "same party" requirement of Rule 804(b)(1).

B

There is no question that Sarvey's first deposition presented the United States (acting through the CFTC) with an adequate "opportunity" to develop his testimony. Such an opportunity, however, is not enough to satisfy Rule 804(b)(1)'s standard. The United States must also have had a similar (although not necessarily identical) motive then as now for doing so. *United States v. Miles*, 290 F.3d 1341, 1353 (11th Cir. 2002). Whether the motive of the United States, acting through a civil enforcement agency, is similar enough to its interests when it engages in criminal enforcement depends on a number of factors, including the substantive law that each is enforcing, the factual overlap between the two proceedings,

the type of proceeding, the potential associated penalties, and any differences in the number of issues and parties. See, *e.g., United States v. Feldman*, 761 F.2d 380, 385 (7th Cir. 1985).

In our view, these factors support the conclusion that the CFTC and the Justice Department here had similar motives to develop Sarvey's deposition testimony. See *United States v. McClellan*, 868 F.2d 210, 214-15 (7th Cir. 1989). Both were investigating the same underlying conduct with an eye to taking enforcement action, and so they shared the same motive to find out what went on. In fact, aside from the Department's need to prove the jurisdictional fact of the use of the wires, the agency and the Department alleged and needed to prove the same allegations, as a comparison of the CFTC's civil complaint and the indictment demonstrates. Furthermore, although the CFTC proceeding was civil in nature and the present prosecution criminal, the deterrent effect of a large civil penalty (like the one that the court ultimately imposed against Sklena) can be similar to that of a criminal sentence. See, *e.g., Hudson v. United States*, 522 U.S. 93, 105 (1997); Richard A. Posner, *An Economic Theory of Criminal Law*, 85 COLUM. L. REV. 1193, 1204-05 (1985). We do not mean to suggest that Sklena's civil penalty was so severe that it was in reality a criminal sanction, see *Hudson*, 522 U.S. at 104; rather, we note only that deterrence is often a goal of both civil and criminal penalties. In this case, in order to enforce the laws regulating commodities markets, the CFTC and the United States (acting through the Department) had essentially the same incentive to develop Sarvey's

factual testimony about the events of April 2, 2004. We therefore conclude that Sarvey's deposition was admissible under Federal Rule of Evidence 804(b)(1).

C

In most cases, we would be ready at this point to consider whether the district court's mistaken decision amounts to harmless error or if it warrants reversal. This case, however, includes one more wrinkle. In a post-trial decision on a motion for a new trial, the district court reaffirmed its decision that Sarvey's testimony was excludable as hearsay, but it went on to rule for the first time that the testimony was also properly kept out under Federal Rule of Evidence 403. We have observed before that it is "unusual" for a "district court [to exclude] evidence under one theory of law during trial and then advance an alternative rationale . . . after trial." *United States v. Albiola*, 624 F.3d 431, 438 (7th Cir. 2010). But the district court was entitled to bring up this alternate rationale, and so we proceed to consider whether the exclusion of Sarvey's deposition can be justified under Rule 403.

In its post-trial ruling, the court stated that Sarvey's testimony was "cumulative." It also concluded that the testimony was "not trustworthy" because it was "self-serving," because Sarvey "was not available for proper cross-examination," and because the testimony was not preserved on videotape. Even though a videotape would have been useful, however, the absence of one and hence the need to rely on a written

transcript is not reason enough to exclude the evidence. The characterization of Sarvey's statements as "self-serving" is also unhelpful. To say that evidence is "self-serving" tells us practically nothing: a great deal of perfectly admissible testimony fits this description. See *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003). As for the cross-examination point, even though the criminal prosecutors obviously could not cross-examine the deceased Sarvey, the CFTC's lawyers (who, as we have already explained, had an almost identical motive to that of the Department of Justice's prosecutors) did. And our examination of the trial record convinces us that Sarvey's deposition was not cumulative. To the contrary, Sarvey's testimony would have added an important fresh perspective to the evidence. Although it is true that Sarvey's testimony may not have been the "the *only* way that Sklena could present his case," it was a *permissible* way, and Sklena was entitled to make his case with the evidence of his own choosing. *Old Chief v. United States*, 519 U.S. 172, 186-89 (1997); *Blue v. Int'l Brotherhood of Elec. Workers Local Union 159*, 676 F.3d 579, 585 (7th Cir. 2012). The district court should have allowed Sklena to admit Sarvey's deposition testimony into evidence.

D

Now we are ready to decide whether the district court's error was harmless. See FED. R. CRIM. P. 52(a). It was not. Sarvey's testimony corroborates Sklena's account of the timing of the trades at the CBOT. It also impugns

the credibility of the government witnesses who suggested a time line for the trading activity in question. Sarvey's testimony provides additional insight into Sarvey's and Sklena's private conversation on the trading floor—the conversation, recall, that others could not overhear, but that the government portrays as the basis for the Sarvey-Sklena conspiracy to engage in non-competitive trades. It will be up to the new trier of fact, of course, to decide how much weight to give to Sarvey's account, and if the trier of fact rejects it or discounts it heavily, Sklena might find himself convicted again. On the other hand, if the trier of fact credits Sarvey's statements, it may change its assessment of the remainder of the evidence. As in *United States v. Loughry*, 660 F.3d 965, 975 (7th Cir. 2011), the evidence against Sklena, while sufficient, was far from overwhelming. The judgment of the district court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.