**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

No. 21-1543

───────────

TERRI COWGILL,

> Plaintiff - Appellant,

v.

FIRST DATA TECHNOLOGIES, INC.; FISERV SOLUTIONS, LLC,

> Defendant – Appellees.

───────────

Appeal from the United States District Court for the District of Maryland, at Baltimore. Albert David Copperthite, Magistrate Judge.  (1:19-cv-02565-ADC)

───────────

Argued:  March 10, 2022                          Decided:  July 22, 2022

───────────

Before GREGORY, Chief Judge, THACKER, and QUATTLEBAUM, Circuit Judges.

───────────

Affirmed in part, vacated in part, and remanded by published opinion.  Chief Judge Gregory wrote the opinion, in which Judge Thacker joined.  Judge Quattlebaum wrote a separate opinion concurring in part and dissenting in part.

───────────

Edward Patrick McDermott, Sr., LAW OFFICE OF E. PATRICK MCDERMOTT, Annapolis, Maryland, for Appellant.  Charles B. Jellinek, BRYAN CAVE LEIGHTON PAISNER LLP, St. Louis, Missouri, for Appellees.

───────────

GREGORY, Chief Judge:

This appeal arises from the district court's grant of summary judgment to First Data Technologies, Inc. on former employee Terri Cowgill's failure-to-accommodate and disability discrimination claims, as well as the district court's dismissal of Cowgill's retaliation claim. Because the court erred in holding that there are no genuine issues of material fact precluding summary judgment on the disability discrimination claim, we must vacate its judgment and remand for further proceedings consistent with this opinion.

I.

First Data Technologies, Inc. ("First Data"), a credit and debit card processing company, employed Terri Cowgill ("Cowgill") as a call center representative from 2004 until September 15, 2015. In her role, Cowgill answered calls from customers regarding transaction disputes. Cowgill, like all other call center representatives, was expected to make certain efforts to engage with a customer before disconnecting a call. For example, she was expected to introduce herself, identify the department she was in, and make attempts to say hello to the customer at least three times before terminating the call. Call center representatives were to refrain from engaging in "call avoidance," which refers to a broad category of prohibited behaviors, including, but not limited to, not answering or "opening" a call promptly and releasing a call prematurely. During the nine years that preceded the termination of Cowgill's employment, she "retained a spotless disciplinary

2

record"—except when placed on a 30-day Improvement Action Plan ("IAP") in September 2006—and "[she] routinely received above-average performance reviews." J.A. 294.[1]

On January 20, 2015, Cowgill submitted a request pursuant to the Family and Medical Leave Act ("FMLA") as a result of back pain she was experiencing from an automobile accident that occurred 15 days earlier. The written physician's note Cowgill submitted to First Data stated: "reduced work schedule: 4 hour(s) per day; 3-5 days per week" and "1/20/15 to 2/20/15." J.A. 288. First Data approved this request. The approval letter read in part: "Your request for an intermittent leave of absence . . . has been approved for the following dates: Leave Start Date—01/15/2015[;] Leave End Date—02/20/2015. The health care provider indicated that you may need time off to care for yourself, within the following parameters: Frequency—4 hours per day, 3-5 days per week." J.A. 291. The letter further explained that "[e]mployees on an intermittent leave of absence": (i) "Must attempt to schedule doctor's appointments during non-work hours"; (ii) "Can be recertified after the leave end date, if the need still exists"; (iii) "Must notify [First Data] if anything regarding this intermittent leave changes or if this intermittent leave is no longer needed"; (iv) "Must follow [] business unit's call in procedures"; and (vi) "Must designate [] absence[s] as FMLA when calling in." *Id.* The approval letter also stated that, if Cowgill had any questions, she should contact the Human Resource ("HR") Service Center.

Eight months later, in August 2015, Cowgill recertified her request for FMLA leave. First Data again approved the request. According to the approval letter, the "intermittent

---

[1] The record suggests that First Data employees are placed on an IAP when they receive a Final Written Warning.

3

leave of absence" began on August 20, 2015 and would end on February 20, 2016, with a frequency of one to two days per month.  J.A. 292.

Though First Data approved Cowgill's FMLA requests, Cowgill testified that First Data refused to grant the accommodation she requested:

> Q:  . . . . What is the reasonable accommodation that you requested that you contend the company refused to grant?
>
> A:  My doctor requested that I be put on a reduced schedule— four hours per day, three to five days per week—while I was going through physical therapy. . . .
>
> Q:  Was that request for intermittent leave approved by the company?
>
> A:  Yes, sir.
>
> Q:  Did you take reduced hours and reduced days off?
>
> A:  No.
>
> Q:  Why not?
>
> A:  Well, let me correct that.  I took reduced hours off for my physical therapy, but First Data never reduced my actual schedule to four hours per day three to five days per week. . . .
>
> Q:  And given th[e] approval, can you tell me how or why you believe that First Data failed to accommodate this request for a reduced schedule?
>
> A:  Because every day, I went in and checked my schedule and it wasn't reduced.
>
> Q:  Did you share that with anyone that you were still on the schedule?
>
> A:  Dawn Rowe multiple times.[2]

---

[2] Dawn Rowe was Cowgill's supervisor for the last five years of Cowgill's employment.

Q: And what did she say when you shared that with her?

A: . . . [S]he told me while my physical therapy was goin' on to just go ahead and whenever I had to leave for physical therapy, to call Workforce Management and they would . . . go in and schedule my physical therapy. So she told me I was to call them when I left for physical therapy and then call 'em when I got back from physical therapy.

Q: . . . . And was there some other manner in which you think that the company should've accommodated you? I mean, . . . if she said, if you can't come in 'cause you have therapy or you're hurting, don't come in, . . . what's the difference whether you're scheduled or not?

A: Because we have schedule compliance. That's part of . . . the reviews . . . . So unless it's put in my schedule, that actually counts against me. . . .

Q: Well, did anyone ever tell you that they were counting your time away at physical therapy or when you said you were hurting and couldn't come in against you? . . .

A No. But if—don't tell me if I called Workforce Management when I left for physical therapy, then it would be noted as FMLA, which, obviously, would be excused.

Q: Okay. . . . [J]ust so I understand it, your position is that the company didn't grant your request for time away from work on an intermittent basis or . . . reduced basis because they actually left you on the schedule?

A: My position is they never actually reduced my schedule, so I can't pick which days and which hours I actually wanna work and just show up for those days and hours.

Q: But they did say if you need to be off because you have physical therapy or because your condition's flaring up, just call Workforce Management and don't come in.

A: No. . . . Well, what I'm trying to say to you [is that] [b]ecause they did not say, okay. You have Monday, Wednesday, and Fridays off. That's your three days per week. Then I could've scheduled my going to my doctor and said,

5

okay. I need my physical therapy for Monday, Wednesday, and Friday. They never did that.

Q: But to be clear, they said if you needed to go at physical therapy, you should just go. Call Workforce Management and go.

A: . . . . Correct. . . .

Q: . . . . So after you'd been approved for this leave, was there ever any day where you had worked four hours per day on the schedule and you said, . . . I can't work anymore so I'm gonna go tell Dawn Rowe I've had enough. . . . I gotta go. Pursuant to my FMLA intermittent leave, I'm telling Workforce Management I gotta go today and . . . I'm not working?

A: . . . . I did leave one day. I just stood up and put on my coat. She was across the room and she come walking towards me and asked me if I was okay. And I said, no. I'm going home.

Q: And what did she say?

A: Nothin'.

Q: Did you call in to Workforce Management, said, I'm taking this time off for FMLA?

A: Yeah. I woulda had to do that and call her extension before I even left, so I'd done that before I even stood and put on my coat. . . .

Q: . . . . Again, notwithstanding the fact that your schedule had not been changed, if you needed to go to physical therapy or if you were hurting and had to go, . . . the company was fine and approved you to take that leave. Correct?

A: I can't say that they were fine. I just called Workforce Management, told them I was leavin', and I got designated as FMLA so it didn't hurt my schedule compliance. . . .

Q: All right. . . . [D]id you ever tell Ms. Rowe, hey, this is one of those days where I'm flaring up. I need to take off today?

A: I don't recall. . . .

6

Q: And your physician's note—was you may need to take one to two days off a month. It wasn't required that you be scheduled off one to two days a month. Correct?

A: I believe it said that I could experience flare-ups.

Q: And so the company had approved you for that. When you have a flare-up, let us know and it's approved for intermittent leave?

A: Correct.

Q: Do you recall ever—any instance after that had been approved where you actually had to say, I'm having a flare-up today. I can't come in?

A: I can't recall.

Q: . . . . So, as you sit here today under oath of this deposition, you can't recall any other time after you'd been approved for that leave in August 20 of 2015 where you requested a time off and nobody didn't give you the time off?

A: Correct. . . .

Q: [A]s you sit here today, you can't recall whether you actually ever needed . . . to take a day off?

A: Correct. I don't.

Q: And is it fair to say then that you can't remember any instance where the company ever denied you a day off pursuant to your approved FMLA intermittent leave?

A: The one to two days per month? Correct. I didn't say that.

Q: And other than periodic time off from work under the FMLA, was there ever any other accommodation requests you made of the company?

A: Not that I recall.

J.A. 239–45, 248–54, 256–59, 334. Cowgill also testified to the following:

Q: On any day where you were on the schedule, did you ever— and you felt like it's just too uncomfortable to work today, you

7

> know, . . . I just can't come in, did you ever call Dawn and say, I can't come in. I'm taking this as my . . . my approved intermittent leave?
>
> A:   Well, February the 11th.   That's the day I got the occurrence for attendance.
>
> Q:   Right.   Okay. . . . [Y]ou got written up for that. . . . [W]hoever was processing that, didn't realize that that was still covered time for you for FMLA.   Correct?
>
> A:   That's what they said. . . .

J.A. 340–41.

On February 11, 2015, Rowe had met with and issued Cowgill a "Final Written Warning" ("FWW").  The warning stated that Cowgill had accumulated over 64 hours of unscheduled absences and advised that any additional unscheduled absence before June 26, 2015 may result in the termination of her employment.  The warning further noted that, "[i]n adherence with the [] Attendance Policy, unscheduled absences of more than 48 hours are given a Final Warning due to the severity of the issue."  J.A. 375.  One week later, Cowgill met with HR personnel, Annette Wood, and told Wood that Rowe was harassing her and threatening her job.  Cowgill further explained that the absences for which she was disciplined were a part of approved FMLA leave.  Wood withdrew the warning.  According to Cowgill, the withdrawal was "based on the fact that . . . Dawn Rowe had vouched for [her]."  J.A. 316.  "It . . . wasn't taken back because it was done in error for FMLA or anything like that.  [Wood] [sat] there and she either called Dawn or she pretended to call Dawn and [came] back and said that because I was such a good rep, she was gonna have it erased was her word."  J.A. 314–16.  Cowgill declared that she was never told that the

8

FWW was a mistake and, during the meeting, Wood told her that she needed to do what she had to do to "protect" her job.  J.A. 297.

On August 4, 2015, after listening to a recording of a call that Cowgill received on July 10, 2015, Rowe and Cowgill met again.  At the beginning of the meeting, Rowe brought up Cowgill's pending FMLA recertification.  When Cowgill told Rowe that she needed the accommodation request recertified, Rowe began discussing the July 10 call.  Rowe had concluded that Cowgill engaged in call avoidance by failing to demonstrate restraint and courtesy with the caller and terminating the call abruptly.  Rowe informed Cowgill that she was being placed on a 90-day IAP, which informed Cowgill that "[f]urther instances of call avoidance or unprofessionalism may result in further corrective action[,] including termination."  J.A. 385; *see also* J.A. 127, ¶¶ 26, 31.  According to Cowgill, First Data has a policy of reviewing questionable calls within two days and First Data deviated from its procedure by waiting almost a month to address the July call.  And the IAP noted that, starting on August 13, Cowgill and Rowe would meet every Thursday for performance coaching, but only one meeting took place and the extent of the coaching was Rowe's single statement to Cowgill to "play pretty."  J.A. 321.

Approximately one month later, on September 9, a customer submitted a negative survey following a call with Cowgill, noting that she prematurely disconnected the call.  On September 15, Rowe played the recording for Cowgill.  The parties dispute what happened during the call.  According to Rowe, the recording revealed a man talking in the background for 26 seconds and saying "hello" just before Cowgill disconnected the call.  There was no greeting at the beginning of the call or any evidence that Cowgill tried to

9

engage with the customer. And when Rowe asked Cowgill whether there was any issue with her equipment, Cowgill stated there was not. According to Cowgill, she did greet the customer. But she could not hear anyone on the other end of the line, and followed company protocols by asking if anyone was on the line three times. No one responded to her greetings, and she heard voices only in the background and, therefore, initiated a disconnection. After she did so, she heard a man say "hello" and she attempted to reconnect the call, but it was irretrievable. When Rowe asked if her equipment was working correctly, Cowgill claims that she said she did not know. Cowgill also testified that the Data Center call sheet did not note a failure to do the opening, which would have occurred had she not engaged in a proper opening. Cowgill stated that she did not hear her opening when Rowe played the recording for her and believed that Rowe played only part of the call. First Data has refused to produce the recorded call. *See* J.A. 301, 407.[3]

Concluding that the September call constituted a second act of call avoidance in violation of Cowgill's IAP, First Data terminated Cowgill's employment on September 15, 2015. According to Cowgill, the comparators terminated for call avoidance as noted by First Data in its motion for the Equal Employment Opportunity Commission ("EEOC") to reconsider its Reasonable Cause Determination were given warnings prior to being placed on an IAP. J.A. 399–405. When Rowe sought approval to terminate Cowgill's employment, Shelly Williams, the HR Director, responded via email:

---

[3] In a communication to the Office of Unemployment Insurance, First Data states: "The final incident took place on or around the claimant's last day of work. The employer is not going to provide a recording of the call." J.A. 407.

> Terri's date of hire is 2004. She received a "3" rating in her 2014 and 2013 year-end performance evaluations.[4] I'm curious what she received in her mid-year 2015 evaluation.
>
> I reviewed the [final warning] you sent. Was Terri's behavior of becoming upset with a customer and disconnecting a call out of character for her? She received a [FWW and IAP] as the first level of corrective action. I'm trying to understand what is motivating Terri's decline in performance.

J.A. 397. Cowgill had received an "above-average" review in her 2015 mid-year evaluation. J.A. 294.

In August 2017, Cowgill filed a charge of discrimination against First Data with the EEOC, alleging disability discrimination under the Americans with Disabilities Act ("ADA"). Finding no evidence of an ADA violation, the EEOC issued a dismissal and notice of rights.

On September 5, 2019, Cowgill filed her Complaint against First Data and Fiserv Solutions, LLC in the district court,[5] alleging disability discrimination pursuant to the ADA, failure-to-accommodate under the ADA, and retaliation pursuant to the ADA and FMLA. First Data moved to dismiss Cowgill's FMLA retaliation claim as time-barred, as well as Cowgill's ADA retaliation claim because Cowgill failed to exhaust her administrative remedies. The district court granted First Data's motion. First Data later

---

[4] The call representatives were given ratings of 1, 2, or 3, with the latter serving as the best possible performance evaluation.

[5] The district court subsequently dismissed Fiserv from the case, finding Cowgill failed to allege sufficient facts to show that Fiserv and First Data were integrated employers or that Fiserv was involved in Cowgill's termination. Cowgill does not challenge this ruling.

moved for summary judgment on Cowgill's disability discrimination and failure-to-accommodate claims, and the district court granted this motion too.

Cowgill now appeals the district court's dismissal of the ADA retaliation claim, as well as the grant of summary judgment as to the disability discrimination and failure-to-accommodate claims.

## II.

We review a district court's grant of a motion to dismiss for failure to state a claim de novo, *Ndambi v. CoreCivic, Inc.*, 990 F.3d 369, 371 (4th Cir. 2021), and if timely raised by the defendant, failure to exhaust administrative remedies warrants dismissal under Rule 12(b)(6), *Stewart v. Iancu*, 912 F.3d 693, 702 (4th Cir. 2019). This Court reviews a district court's grant of summary judgment de novo, "applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." *Heyer v. U.S. Bureau of Prisons*, 849 F.3d 202, 208 (4th Cir. 2017) (quoting *T-Mobile Ne., LLC v. City Council of Newport News*, 674 F.3d 380, 384–85 (4th Cir. 2012)).

## III.

## A.

We first address Cowgill's failure-to-accommodate claim. The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). One form of discrimination is failing to make "reasonable

12

accommodations" for a disabled employee's "known physical or mental limitations," unless the employer "can demonstrate that the accommodation would impose an undue hardship" on its business. *Id*. § 12112(b)(5)(A). To survive summary judgment on such a claim under the ADA, a plaintiff must show (i) she was disabled, (ii) the employer had notice of her disability, (iii) she could perform the essential functions of her position with a reasonable accommodation, and (iv) the employer refused to make such accommodation. *Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 345 (4th Cir. 2013). This appeal turns on the fourth element: Whether First Data refused to make the requested reasonable accommodation.

Before opining on the fourth element, we must first consider what accommodation Cowgill requested. In her briefs, Cowgill argues that she requested a "reduced schedule" that allowed her to "pick which days and which hours [she] actually [wanted to] work and just show up for those days and hours." J.A. 334. But Cowgill never made this request. Indeed, during her deposition, Cowgill stated that "[her] doctor requested that [she] be put on a reduced schedule—four hours per day, three to five days per week—while [she] was going through physical therapy." J.A. 240. When asked whether "that request for intermittent leave [was] approved by [First Data]," Cowgill responded, "yes." *Id.* And when asked whether she "[took] reduced hours and reduced days off," Cowgill responded affirmatively, explaining that she "took reduced hours off for [her] physical therapy." *Id.*

Our conclusion that Cowgill never asked for an automatic reduction in her work schedule is further supported by the written physician's note. The note contemplated ebbs and flows in the amount of time Cowgill needed to spend away from her work because of

13

her back pain—indeed, it states that Cowgill should reduce her work schedule for four hours a day for as little as three days or as much as five days per week. During her deposition, Cowgill did not deny that the physician's note stated that "[she] *may* need to take one to two days off a month" and did not actually "*require*[] that [she] be scheduled off one to two days a month." J.A. 256–57 (emphasis added). Instead, she emphasized that the note said that she could experience flare-ups; but, as Cowgill conceded, she could leave whenever she experienced these flare-ups. J.A. 257. And given the nature of the accommodation request, First Data could not have automatically reduced Cowgill's schedule because it had no way of knowing whether Cowgill would experience flare-ups on three, four, or five days of the week and how many hours of those days she would endure pain absent leave. For these reasons, the only reasonable conclusion is that Cowgill simply asked to work less hours—not to be taken off the work schedule on specific days or for a specific number of days for the duration of the FMLA leave period.

Even assuming that Cowgill's requests for intermittent FMLA leave constitutes a request for a reasonable accommodation under the ADA, First Data continued to approve Cowgill's requested leave, Cowgill took the requested leave, and thus First Data provided the requested accommodation. Since Cowgill fails to satisfy this fourth element, we affirm the district court's grant of summary judgment on the failure-to-accommodate claim.[6]

---

[6] First Data contends that Cowgill's failure-to-accommodate claim fails as a matter of law because her only alleged request for accommodation—her request for intermittent FMLA leave—does not actually constitute a request for a reasonable accommodation under the ADA. This Court has yet to address this issue. But we need not reach it here because, as explained, even assuming that Cowgill had a disability as defined by the ADA, that (Continued)

14

B.

We now turn to Cowgill's disability discrimination claim. To establish a prima facia case of disability discrimination, a plaintiff must show (i) she was disabled, (ii) she was discharged, (iii) she was fulfilling her employer's legitimate expectations when she was discharged, and (iv) the circumstances of her discharge raise a reasonable inference of unlawful discrimination. *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 272 n.9 (4th Cir. 2004). If the employee makes this showing, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Lettieri v. Equant*, 478 F.3d 640, 646 (4th Cir. 2007). If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation was "actually a pretext for discrimination." *Id*. (citation and internal quotation marks omitted). The parties contest the third and fourth elements, as well as the pretext prong.

i.

To satisfy the third element, a plaintiff need not "show that [s]he was a perfect or model employee. Rather, a plaintiff must show only that [s]he was qualified for the job and that [s]he was meeting [her] employer's legitimate expectations." *Haynes v. Waste Connections, Inc*., 922 F.3d 219, 225 (4th Cir. 2019). The district court concluded that Cowgill failed to meet First Data's legitimate expectations. We disagree.

---

Cowgill was a qualified individual under the ADA, and that Cowgill's request for intermittent FMLA leave also constituted a request for a reasonable accommodation under the ADA, the record does not support a view that First Data refused to accommodate any such request.

15

If an employer genuinely believed that one of its employees was performing poorly on metrics the employer perceives as important (as First Data claims here), it seems unlikely that it would rate the employee's performance highly. *Sempowich v. Tactile Sys. Tech., Inc.*, 19 F.4th 643, 650 (4th Cir. 2021) (concluding that an issue of material fact existed as to whether the employee met legitimate expectations because, prior to termination, employer rated the employee's performance highly, and gave her awards, a salary raise, and an equity grant); *Haynes*, 922 F.3d at 225 (explaining that the employee may have met legitimate expectations when recent signals suggested that the employer viewed her performance positively). Yet that is what happened here. The record shows that Cowgill "routinely received above-average performance reviews," J.A. 294, and during her 2014 year-end and 2015 mid-year reviews, she received the highest rating possible—a "3." In addition, when First Data withdrew the previous FWW just a few months prior to Cowgill's termination, Wood told Cowgill that First Data was doing so because Cowgill was "such a good rep" and Rowe had vouched for her. J.A. 234.

Considering that Cowgill is entitled to the benefit of all inferences as the non-movant, we conclude that there is a genuine dispute as to whether Cowgill met First Data's legitimate expectations.

ii.

To satisfy the fourth element of a disability discrimination claim, a plaintiff must show that the adverse action occurred under circumstances that raise a reasonable inference of unlawful discrimination. *Rohan*, 375 F.3d at 272 n.9. The district court found that

16

Cowgill failed to establish this element, but we conclude that a genuine issue of material fact exists here too.

It is well-established that "close temporal proximity weighs heavily in favor of finding a genuine dispute as to causation." *Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 575 (4th Cir. 2015); *see Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 706 (4th Cir. 2001) (finding that temporal proximity alone can create a genuine dispute to causation); *King v. Rumsfeld*, 328 F.3d 145, 151 & n.5 (4th Cir. 2003) (finding that a two-and-a-half month gap between protected activity and an adverse employment action was sufficiently narrow to establish the causation prong of the prima facie case solely on the basis of temporal proximity). In *Jacobs*, we concluded that the employee's termination "just three weeks after sending her e-mail disclosing her disability and requesting an accommodation" served as "affirmative evidence" from which a reasonable jury could conclude that the employee was terminated because of her disability. 780 F.3d at 575. Cowgill disclosed her disability and requested an accommodation on January 20, 2015 and—exactly three weeks later—on February 11, First Data placed Cowgill on an IAP after she used the FMLA leave granted to her. That First Data eventually withdrew the FWW does not erase the mark of discriminatory motive. Similarly, in August, Rowe placed Cowgill on an IAP *immediately* after Cowgill confirmed that she was requesting recertification of FMLA leave. The extremely short time gap between these two events raises an even stronger discriminatory inference than that found in *Jacobs*.

Moreover, during the meeting in which Wood withdrew the January 2015 FWW, Wood told Cowgill that she needed to "protect" her job. A reasonable factfinder could

17

conclude that this statement reveals a discriminatory motive because it suggests that Cowgill's job would remain unprotected if she allowed her disability to get in the way of her work performance.

Taken together, this evidence is sufficient to create a jury question regarding the causation prong of Cowgill's prima facia disability discrimination claim.

iii.

Because Cowgill established her prima facie case, the burden shifts to First Data to articulate a "legitimate, nondiscriminatory reason" for terminating her employment. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). First Data has satisfied its burden of articulating a legitimate, nondiscriminatory reason for terminating Cowgill's employment, as it explained that Cowgill was fired following her second instance of call avoidance. Faced with this nondiscriminatory explanation for her termination, Cowgill bears the burden of establishing that First Data's proffered explanation is pretext for disability discrimination. *Burgess v. Bowen*, 466 F. App'x 272, 277 (4th Cir. 2012) (explaining that, if a plaintiff can demonstrate "that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination," summary judgment is not appropriate) (quoting *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)). We believe that Cowgill has made such a showing here.

To start, "'especially relevant' to a showing of pretext would be evidence that other employees who were similarly situated to the plaintiff (but for the protected characteristic) were treated more favorably." *Laing v. Federal Exp. Corp.*, 703 F.3d 713, 719 (4th Cir. 2013) (quoting *McDonnell Douglas*, 411 U.S. at 804). *But see Bryant v. Aiken Reg'l Med.*

18

*Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003) (concluding that a plaintiff is "not required as a matter of law to point to a similarly situated . . . comparator in order to succeed" on a discrimination claim).  We have emphasized that a comparison between similar employees "will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993).  But "[w]hile there is no bright-line rule for what makes two jobs 'similar' under Title VII," *Spencer v. Virginia State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019), *as amended* (Mar. 26, 2019), relevant considerations include whether the plaintiff and comparator "dealt with the same supervisor, [were] subject to the same standards and[,] . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (per curium) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)) (alterations in original); *see also Spencer*, 919 F.3d at 207 ("[T]he plaintiff must provide evidence that the proposed comparators are not just similar in some respects, but similarly-situated in all respects.").

Cowgill identifies as comparators the two employees First Data identified when submitting its motion for the EEOC to reconsider its Reasonable Cause Determination.  J.A. 399–405.  A reasonable factfinder could conclude that these comparators are similarly-situated to Cowgill in all relevant respects—specifically, both employees answered customer calls and were prohibited from engaging in call avoidance.  Notably, when First Data submitted information regarding these two comparators to the EEOC, it did not suggest the comparators were different in any respect, explaining that this "evidence

19

demonstrates that other employees outside of [Cowgill's] protected class were also discharged for call avoidance" and "unequivocally demonstrates that [Cowgill] . . . would have been terminated even in the absence of her alleged disability."  J.A. 399.  And on appeal, First Data's only argument as to why the two proposed comparators do not qualify as comparators is that they did not report to Rowe, Cowgill's supervisor.  Response Br. at 38 n.9.  In discussing whether plaintiffs and their comparators "share the same supervisor," we have relied on *Mitchell v. Toledo Hosp.*, 964 F.2d 577 (6th Cir. 1992).  *See Haynes*, 922 F.3d at 223–24; *Haywood* , 387 F. App'x at 359 (per curium).  As *Mitchell*'s progeny has long noted, plaintiffs do not need to share the same supervisor in every case, and that comparison point is not a bar to relief in a case like this one, where the comparators are otherwise similar in "all relevant respects."  *See McMillan v. Castro*, 405 F.3d 405, 414 (6th Cir. 2005) ("[T]he requirement that a plaintiff and her comparator 'must have dealt with the same supervisor' to be considered similarly situated does not automatically apply in every employment discrimination case."); *see also Louzon v. Ford Motor Co.*, 718 F.3d 556, 563 (6th Cir. 2013) ("[W]e have never read 'the "same supervisor" criteri[on]' as an 'inflexible requirement.'" (quoting *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (concluding that same-supervisor requirement does not apply to all factual situations; rather, comparators must be similar in "relevant aspects").

There is a sufficient basis for a reasonable factfinder to conclude that Cowgill—despite being similarly-situated to the comparators—was treated differently.  For example,

20

after engaging in call avoidance and being placed on a FWW, Comparator A was given special coaching attention, including reassignment of her work location to sit next to two team leaders for support and assistance. J.A. 401. Yet, in spite of its commitment to coach Cowgill,[7] First Data failed to follow through and ultimately did not go to the same lengths as it did with Comparator A to shore up Cowgill's purported deficiencies. *See Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985) ("The most important variables in the disciplinary context, and the most likely sources of different but nondiscriminatory treatment, are the nature of the offenses committed and the nature of the punishments imposed."). In addition, the comparator evidence suggests that—for those without a disability—something more than call avoidance is required for termination. Comparator A's termination letter noted that, "[s]ince last year, [Comparator A] has not been to work on time," indicating that the termination was catalyzed by not only instances of call avoidance but also attendance infractions. J.A. 401. Similarly, Comparator B fell onto First Data's radar after engaging in at least one act of call avoidance—taking excessively long breaks—*and* committing attendance infractions within a 10-day period (and, as a result, was placed on a FWW). J.A. 404–05. But Cowgill's termination was prompted by call avoidance infractions alone—not anything more.

Williams' response to Rowe's termination request serves as an additional layer of pretext evidence. Williams appeared to question whether the disciplinary process escalated

---

[7] The July 2015 IAP stated that Cowgill and Rowe "[would] meet on a weekly basis at 10:30am every Thursday starting August 13, 2015" and, "[d]uring these meetings, [they] [would] review a recorded call and discuss any opportunities that may arise." J.A. 385.

21

too quickly, asking whether "[Cowgill's] behavior of becoming upset with a customer and disconnecting a call [was] out of character for her" immediately before stating that "[Cowgill] received a [FWW and IAP] as the first level of corrective action." J.A. 397. Based on this, a reasonable factfinder could be persuaded that First Data engaged in a disparate application of its progressive discipline when Cowgill was up for discussion.

Separately, we note that when "facts, if believed, would allow a trier of fact to think [the employer] was simply looking for a reason to get rid of [the employee]," the employer's proffered explanation may not be worthy of credence. *Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 296 (4th Cir. 2010). Here, First Data deviated from its usual procedure of reviewing questionable calls within two days and confronted Cowgill with the July call almost a month after it occurred.[8] A reasonable factfinder could conclude that First Data searched for and found the single nugget of misconduct that allowed it to place Cowgill on an IAP and set the course for her termination. Moreover, it is highly

---

[8] First Data argues that Cowgill "offers no evidence outside of her own self-serving testimony to support this proposition," rendering this argument unpersuasive. Response Br. at 36–37. It is of no moment that Cowgill's fact testimony is "self-serving." *See Johnson v. Hugo's Skateway*, 949 F.2d 1338, 1345 (4th Cir. 1991), *on reh'g*, 974 F.2d 1408 (4th Cir. 1992) ("While [the plaintiff's] testimony might be viewed as self-serving in isolation, the jury [is] free to weigh it in light of all of the other testimony adduced."); *see also U.S. v. Sklena*, 692 F.3d 725, 733 (7th Cir. 2012) ("To say that evidence is 'self-serving' tells us practically nothing: a great deal of perfectly admissible testimony fits this description."). *Cf. Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004) (concluding that "[a plaintiff's] testimony that she believed her evaluations to be "unfair and untrue and incorrect" is merely a self-serving *opinion* that cannot, absent objective corroboration, defeat summary judgment" (emphasis added)). What is significant is that First Data offers no evidence to the contrary. *See O'Tuel v. Osborne*, 706 F.2d 498, 501 (4th Cir. 1983) (considering "self-serving" evidence because the record was devoid of contrary proof).

22

suspicious that Rowe failed to coach Cowgill toward improvement as contemplated by the IAP. It is hard to believe that a company that is concerned about curbing call avoidance would fail to follow through when—pursuant to its own plan—that help is required to improve an employee's work performance.

Because a reasonable factfinder could conclude that First Data's proffered explanation served as pretext for an impermissible consideration, we find that Cowgill satisfied the final requirement of her disability discrimination claim and vacate the district court's grant of summary judgment on this issue.

C.

Finally, we consider Cowgill's retaliation claim. "Before a plaintiff has standing to file suit under Title VII, he must exhaust his administrative remedies by filing a charge with the EEOC." *Bryant v. Bell Atlantic Maryland, Inc.*, 288 F.3d 124, 132 (4th Cir. 2002). "The exhaustion requirement ensures that the employer is put on notice of the alleged violations so that the matter can be resolved out of court if possible." *Miles v. Dell, Inc.*, 429 F.3d 480, 491 (4th Cir. 2005) (citing *EEOC v. American Nat'l Bank*, 652 F.2d 1176, 1186 (4th Cir. 1981)). "If a plaintiff's claims in her judicial complaint are reasonably related to her EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in her subsequent civil suit." *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 247–48 (4th Cir. 2000).

Cowgill's EEOC charge states:

> I began working for the above on January 17, 2001, as a Customer Service Representative. On January 5, 2015, I was in a car accident, I sustained injures, which caused me to have

23

a temporary disability. I applied and was approved on January 26, 2015, for intermittent FMLA from January 15, 2015 through February 20, 2015. On February 2, 2015, I was given a final warning for Attendance Policy Violation. I contacted Human Resources, Annette Woods about the final written warning for the use of leave and the final warning was dropped. I had to file paperwork again, for my intermittent FMLA because I was given the wrong forms from Human Resources. On August 4, 2015, I was placed on an Improvement Action Plan for dropping a call. I followed the company's policy and procedures for dropping a call. On August 20, 2015, I was approved again for intermittent FMLA. On September 14, 2015, I was discharged.

My employer stated that I was discharged because I dropped a call.

I believe that I was discriminated against because of my disability in violation of the Americans with Disabilities Act Amendment Act of 2008, with respect to failure to accommodate, discipline and discharge.

J.A. 71–72. The question here is whether Cowgill's claim that she was retaliated against for requesting a reasonable accommodation is reasonably related to her EEOC charge such that it would have reasonably been expected to follow from an administrative investigation of that charge. The district court concluded that it is not. We agree.

As an initial matter, Cowgill did not check the retaliation box on her charge form, and the narrative explaining her charge made no mention of retaliation. *See Miles*, 429 F.3d at 492 (concluding that plaintiff's failure to mark the retaliation box and the fact that the narrative did not mention retaliation supported the conclusion that her administrative charge did not include a retaliation claim).

Cowgill argues that the district court's holding was incorrect because she "identifie[d] the acts of retaliation" in the charge. Opening Br. at 48. We are unpersuaded.

24

Though Cowgill's charge described various events that occurred in the months leading to her termination, the charge states that those events occurred because of disability discrimination—not retaliation. And the events do not necessarily imply that First Data was motivated by a retaliatory impulse. *See Miles*, 429 F.3d at 492; *Chacko v. Patuxent Inst.*, 429 F.3d 505, 509 (4th Cir. 2005) ("[I]f the factual foundation in the administrative charge is too vague to support a claim that is later presented in subsequent litigation, that claim will also be procedurally barred.")

Cowgill further contends the district court should have taken into consideration the fact that, after she filed her charge but before the EEOC issued its final determination, she told an EEOC investigator that First Data "retaliated against and fired [her] because of her disability." Opening Br. at 15, 49. But we have previously explained that it is "objectively illogical to view a private letter from a complaining party to the EEOC as constructively amending a formal charge, given that one of the purposes of requiring a party to file charges with the EEOC is to put the charged party on notice of the claims raised against it." *Sloop v. Memorial Mission Hosp., Inc.*, 198 F.3d 147, 149 (4th Cir. 1999) (citation omitted). At bottom, Cowgill's charge does not allege that First Data retaliated against her because she requested a reasonable accommodation, and it does not otherwise allege facts that would have put First Data on notice that she was charging the company with retaliation.

## IV.

For the foregoing reasons, the judgment of the district court as to Cowgill's disability discrimination claim is vacated and the case is remanded for further proceedings

25

not inconsistent with this opinion. The judgment of the district court as to Cowgill's failure-to-accommodate and retaliation claims are affirmed.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*

QUATTLEBAUM, Circuit Judge, concurring in part and dissenting in part:

My disagreement is a narrow one. I agree with the majority's decision concerning Cowgill's failure to accommodate and retaliation claims. With respect to Cowgill's disability discrimination claim, I also agree that the absence of direct evidence of discrimination requires the application of the *McDonnell Douglas* burden-shifting framework. But I disagree that Cowgill established the third element of that framework—that she was fulfilling First Data's expectations when she was discharged. *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001).

The majority concludes Cowgill met this element based on evidence of positive performance reviews. And it is correct that Cowgill consistently received above-average reviews and that her 2014 year-end review and her 2015 mid-year review—the two most recent reviews before her termination—reflected the highest possible score. If her performance during the time covered by those reviews were at issue, I might agree with the majority.

But those reviews predated the issues First Data cited for terminating her. In July 2015, about three months *after* her most recent 2015 mid-year review, Cowgill got into an altercation with a customer and disconnected the call. In response to that incident, First Data placed Cowgill on an Improvement Action Plan. Cowgill's subsequent termination in September 2015 related to her failure to comply with that Plan.

To be sure, Cowgill questions the timing of the call's quality control review which led to the Improvement Action Plan. She claims the review took place later than the normal two-day period in which calls are reviewed. But she offers no evidence of an actual policy

27

requiring review within two days. Nor does she deny the substance of the customer altercation. Under that record, I do not see how her prior good performance creates a genuine issue of material fact as to whether Cowgill was fulfilling her employer's expectations specifically "at the time of discharge." *Haulbrook*, 252 F.3d at 702.

One may question the need to terminate an employee for violating one Improvement Action Plan after years of good performance. But our role is not that of a "super-personnel department." *Spencer v. Virginia State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019). Our role is to determine if there is a genuine issue of material fact concerning the elements of a disability discrimination claim. And, in my view, the record reveals no genuine issues related to the fact that Cowgill was expected to comply with an Improvement Action Plan yet failed to do so at the time of discharge.

Therefore, I would also affirm the district court's order granting summary judgment in favor of First Data on Cowgill's disability discrimination claim.